Mary Ann KEEFFE, et al.,
Plaintiffs-Appellees,

v.

LIBRARY OF CONGRESS, et al.,
Defendants-Appellants.

No. 84–5464.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 20, 1985.
Decided Dec. 3, 1985.

Stephen D. Keeffe, Washington, D.C., for plaintiffs-appellees.

Gregory S. Walden, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., William Kanter, Atty., Dept. of Justice, and Frank Mack, Office of Gen. Counsel, Library of Congress, Washington, D.C., were on brief, for defendants-appellants.

* Sitting by designation pursuant to 28 U.S.C.

Before MIKVA and GINSBURG, Circuit Judges, and MARKEY,* Chief Judge of the United States Court of Appeals for the Federal Circuit.

·Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This appeal from the District Court raises important questions about the constitutionality of governmental limitations on a congressional employee's off-duty political activities. The Library of Congress seeks to prohibit those activities that it determines will pose a real or apparent conflict of interest with an employee's official duties. The District Court held that the Library of Congress' conflict-of-interest regulations, as interpreted and applied to Congressional Research Service ("CRS" or "the Service") Analysts, were unconstitutionally vague, and therefore declared them null and void. We find that the Library did not violate the Constitution or its enabling statutes when it promulgated a reasonable interpretation of its regulations for prospective application to all CRS analysts. We agree with the District Court, however, that the Library failed to provide plaintiff Keeffe with fair notice that it would apply its new interpretation to her participation at the Democratic National Convention in 1980. Its adverse action against Keeffe must therefore be invalidated. Accordingly, we affirm on different grounds the District Court's award of declaratory and injunctive relief.

## I. BACKGROUND

### A. The Congressional Research Service

The defendant, the Library of Congress, is a congressional agency. See 2 U.S.C. § 171(1) (1982). The Library is divided into departments, and the Congressional Research Service is one of these departments. 2 U.S.C. § 166(a). CRS' mandate is to "advise and assist" congressional committees

§ 291(a) (1982).

in the analysis, appraisal, and evaluation of legislative proposals and recommendations submitted by the executive branch. The CRS is charged with performing these duties "without partisan bias." 2 U.S.C. § 166(d)(1). In practice, the Service's work brings it into contact with Congress in many different ways:

> The Service makes [its] research available, without partisan bias, in many forms including studies, reports, compilations, digests, and background briefings. Upon request, CRS assists committees in analyzing legislative proposals and issues, and in assessing the possible effects of these proposals and their alternatives. The Service's senior specialists and subject analysts are also available for personal consultations in their respective fields of expertise.

C. Goodrum, *Your Work in the Congressional Research Service: An Introductory Operating Manual* i–a (1977). Memoranda prepared by Analysts for congressional clients bear the name of their author. *Id.* at 10.

### B. *Mary Ann Keeffe's Political Activities and The Library's Actions*

1. Administrative adoption of Hatch Act regulations. When Keeffe became an employee of the Library of Congress in 1967, the Library regulated the outside activities of its employees through administrative adoption of the Hatch Act scheme of regulations. The Hatch Act, now codified at 5 U.S.C. § 7324 (1982), by its terms is limited to executive branch employees. The Act provides that these employees "may not take an active part in ... political campaigns." Congress has extended the coverage of the Hatch Act to agencies not specifically covered by the terms of the Act. *See, e.g., American Postal Workers Union, AFL–CIO v. United States Postal Service*, 764 F.2d 858, 862 n. 13 (D.C.Cir. 1985) (Hatch Act and its regulations made applicable to Postal Service by 39 U.S.C. § 410(b)(1) (1982) and 5 C.F.R. § 733.31 (1984)).

2. Promulgation of LCR 2023–7. Keeffe became an Analyst in 1972. She and other employees of the Library are represented by the Congressional Research Employees Association (CREA), one of the plaintiffs-appellees. In June of that year, the Library issued Library of Congress Regulation (LCR) 2023–7, which replaced the scheme modeled on the Hatch Act and now regulates the political activity of Library employees. The regulations are far from ideal in their clarity, and the interaction of their various provisions is an imperfect example of the legal mind at work. The regulation entitled "Unrestricted Political Activities of Library Employees" recognizes the right of Library employees "to engage in political activity to the widest extent consistent with the restrictions imposed by law and by this Regulation." LCR 2023–7, Section 3(A). Under this umbrella-like authorization, the Library has provided a non-exclusive list of unofficial activities in which employees may participate. These include the right to:

> Be a member of a political party or other political organization and participate in its activities to the extent consistent with law and to the extent that such membership does not interfere with official duties or give the appearance of a conflict of interest.

*Id.* at section 3(A)(5). Employees also have the right to attend a "political convention, rally, fund-raising function; or other political gathering," *id.* at section 3(A)(6), and to "[s]erve as a delegate to a political or constitutional convention, so long as such service does not interfere with the time and attention required as a Library employee." *Id.* at section 3(A)(11).

As section 3(A) provides, however, each of these activities is subject to the qualification in section 3(B). This section allows the Library to restrict political activity that would create a real or apparent conflict of interest:

> Paragraph A. of this section does not imply or authorize an employee to engage in political activity in violation of law, while on duty, or while in a uniform that identifies him as an employee. The Library may prohibit or limit the partic-

ipation of an employee or class of employees in an activity recognized by Paragraph A. of this section, if participation in the activity would interfere with the efficient performance of official duties, or create a conflict or apparent conflict of interests.

*Id.* at section 3(B). The Library's regulations are implemented by its General Counsel, who is charged with providing authoritative advice and interpretations of conflict-of-interest questions. *See* LCR 2023–8, section 1. The General Counsel is also responsible for recommending disciplinary or remedial action, if necessary, to the Librarian. *Id.* at section 4.

3. The Summer of 1980. In June, 1980, Library officials learned that Keeffe was a prospective delegate-at-large to the 1980 Democratic National Convention in New York City, and advised her that this activity presented a potential conflict of interest with her official duty to render non-partisan advice. The Library requested a memorandum of facts from her before taking further appropriate action. On July 7, the plaintiff advised the Chief of her Division, Dr. Leon Cole, that her status as a delegate-at-large had been challenged within the party apparatus and was still unconfirmed. Cole replied by memorandum on July 17 that the attendance of CRS employees as delegates at political conventions was subject to the restrictions of the Library's conflict-of-interest regulation. Cole stated that Keeffe's intended participation at the Convention was subject to review and approval by the Library. Cole also requested a written explanation from Keeffe of the possible conflict or appearance of a conflict of interest. On August 5, Keeffe challenged the view that her attendance at the Convention would cause any conflict.

Percolating upwards, the matter soon came to the attention of co-defendant Gilbert Gude, the Director of CRS. On August 7, Gude requested the General Counsel's opinion on the propriety of the plaintiff's attendance at the Convention. The next day, the Office of the General Counsel opined that Keeffe's participation as a delegate could give rise to an actual conflict of interest and would in any event generate an apparent conflict of interest. The opinion referred to the importance of congressional confidence in the impartiality of the services performed by CRS Analysts. The opinion observed that a delegate has an interest in the success of the convention's candidate or party platform. Since an Analyst's work for CRS identifies the Analyst by name, the opinion concluded that congressional clients might have misgivings about whether Keeffe's work was biased or otherwise influenced by political considerations.

Keeffe was not at work when this opinion issued; her annual leave period had begun. Cole, her Division Chief, attempted to contact her by telephoning her home. Keeffe was not there, and Cole recited a message to her Portuguese housekeeper. Cole said that Keeffe's attendance at the convention would generate a conflict of interest and might subject her to disciplinary action. The housekeeper, who was not fluent in English, had her ten-year-old daughter take the message from Cole. Keeffe received the message verbally from the housekeeper's daughter. Despite this message, Keeffe attended the Democratic Convention, which began on August 10.

4. Disciplinary Proceedings. After the Convention, Keeffe returned to the Library at the end of her vacation. Her supervisor directed her not to perform some of the duties she had previously performed, including accepting assignments from congressional clients and communicating with congressional clients without prior authorization. She was directed to return all work requests from congressional clients to her Section Head for reassignment. In September, she received a Notice of Proposed Adverse Action. The notice informed her that the Library intended to transfer her for a period not to exceed one year from her current position as an Analyst to a position in the Service's Office of Assignments, Reference and Special Services. This temporary reassignment made her ine-

ligible for promotion during the period it was in effect, but it did not affect her salary or her rank (GS level). In January 1981, the Library made the proposed adverse action final.

Keeffe appealed the adverse action to a hearing officer. The hearing officer upheld the adverse action, concluding that Keeffe had attended the convention with full knowledge of the General Counsel's determination. Under the collective bargaining agreement between the Library and the CREA, this appeal was her sole administrative remedy.

After the appeal, the Service moved to extend the General Counsel's interpretation to all of its employees. In November 1981, Director Gude issued a memorandum to all CRS supervisors. The memorandum stated that CRS employees as a class of employees are precluded from participation in partisan political activities. According to the memorandum, these activities by definition might result in, or create the appearance of, compromising independence or impartiality. In January 1982, Keeffe was reinstated to her Analyst position.

Keeffe and CREA filed suit in the United States District Court for the District of Columbia in January 1982. They sought a declaratory judgment that the Library's interpretation and application of its regulation had violated Keeffe's first amendment rights. The District Court granted summary judgment for plaintiffs, finding that the regulation as applied was unconstitutionally vague and violated the first and fifth amendments of the Constitution. The trial court declared the regulation null and void, and also ordered specific declaratory and injunctive relief for Keeffe. *See Keeffe v. Library of Congress*, 588 F.Supp. 778 (D.D.C.1984). The Library was directed to expunge all references to the adverse action against her from its personnel records and retroactively to give her any and all benefits to which she would have been entitled, including promotion rights, if she had not been subject to the adverse action. The court also dismissed Keeffe's claim for damages against Gude, finding that de-

fendants were immune from damages since their conduct did not "violate clearly established statutory or constitutional rights which a reasonable person would have known." 588 F.Supp. at 792, quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The dismissal of the claim for damages is not on appeal. The Library appeals only the award of declaratory and injunctive relief.

## II. THE PROSPECTIVE APPLICATION OF THE LIBRARY'S CONFLICT OF INTEREST REGULATION

Plaintiffs argue that the Library's interpretation of its regulations lacks a statutory basis and is unauthorized by the Library's current regulations. Both of these contentions are without merit. Congress' explicit statutory mandate and the regulations, read in light of their history and the plain meaning of "conflict of interest," compel our conclusion that the Library acted well within its authority in promulgating its interpretation. The constitutionality of the interpretation, both as it now applies to future conduct of all CRS Analysts and as it was applied in August 1984 to Mary Ann Keeffe, are discussed separately below.

### A. *Statutory Authorization*

◼ Appellees question whether a statutory basis for the Library's conflict-of-interest regulations exists. To support their position, they emphasize that the Hatch Act does not apply to congressional employees. This observation is correct, but misses the point. It does not follow that absent Hatch Act coverage, an agency is totally precluded from regulating similar political activity by its employees. The legislative branch has given the Library a distinct statutory basis for the regulation of its own employees. Congress created the CRS in the Legislative Reorganization Act of 1970. CRS' *raison d'être* is to serve Congress; to this end, CRS advises and assists Members of Congress and congressional committees. The Act provides that the CRS shall perform these tasks "with-

out partisan bias." 2 U.S.C. § 166. The Act also empowers the Librarian of Congress to make necessary regulations for the governance of the Library. *Id.* at § 136. We conclude that these two statutory grants, taken together, authorize the Library to take appropriate steps to ensure that the CRS discharges its mandate of service to members of Congress "without partisan bias."

B. *Applicability of the Library's Regulations to Employees' Political Activities*

Appellees also contend that the Library's conflict-of-interest regulations do not apply to the off-duty political activities of Library employees. The history of the Library's restrictions on employee activity, the Library's current regulations, and the plain meaning of the term all point in the same direction: the Library's prohibition on real or apparent conflicts of interest unquestionably encompasses partisan political positions that are inconsistent with the Analyst's duty of impartiality. We first examine the regulations that governed Library employees' activities before the current regulations were enacted in 1970.

The precursor to the current regulations was established in 1942, when the Library adopted the Hatch Act scheme to regulate its employees' political activities. Archibald MacLeish, then the Librarian, recognized that the Hatch Act did not cover Library employees. He observed, however, that the spirit of the statute was "in accord with the long established policy" of the Library, and ordered conformity with its requirements as a matter of Library policy. *See* Librarian of Congress General Order No. 1164 (Nov. 6, 1942), General Order No. 1371 (June 29, 1948). The Hatch Act, of course, makes it unlawful for employees in the executive branch to take any active part in political management or in political campaigns. Any person violating the prohibition is subject to immediate removal from office. By ordering compliance with Hatch Act standards, the Library clearly proscribed active political participation by its employees.

█ In 1970, the Library issued more detailed regulations. The broad coverage of these regulations leaves no doubt that they authorize prohibiting a Library employee from serving as a delegate at a partisan political convention. The regulations prohibit staff members from taking any action which might result in or create the appearance of:

(1) Giving inequitable and improper preferential treatment to any person or persons to the prejudice or detriment of others;

(2) Compromising independence or impartiality; or

(3) Affecting adversely the confidence of the public in the integrity of the Library or the government.

Library of Congress Regulation 2023–1, section 2. Employees are also prohibited from taking outside employment or engaging in other outside activities "that establish relationships or property interests that may result in a conflict between their private interests and their official duties." LCR 2023–3, section 2(A)(4). The Library has reasonably concluded that attendance as a delegate at a national political convention is an action that would create precisely these ill effects. We will not disturb the reasonable judgment of an agency of Congress as to the meaning of its own regulations. A delegate has a duty and a private interest to espouse the platform and the party's candidates, while employment as an Analyst imposes the conflicting duty to be and, just as importantly, to appear to be impartial. A CRS Analyst who returned from service as a delegate at a political convention might appear to be giving preferential treatment to some legislators or political views over others; the same Analyst might appear less independent than his colleagues; and the public might have less confidence in the impartiality of the CRS' work. We need not decide these questions. We only determine that once the Library decided these questions as it did, the regulations authorize prohibiting an Analyst

from serving as a delegate to a political convention.

■ The general meaning of the term "conflict of interest" buttresses the Library's reasonable conclusion that its regulations authorized it to prohibit partisan political activity. Plaintiffs argue for a narrow reading that would limit "conflict of interest" to a pecuniary conflict of interest; under such an interpretation, the regulation would only prohibit acceptance of monetary compensation to act in a way that conflicts with the employee's government duties. We think the term has a wider reach, both because of the context in which it appears here and by its ordinary meaning. Pecuniary interests need not be involved. A conflict of interest arises when there is "a conflict between the private interests and the official responsibilities of a person in a position of trust (as a government official)." *Webster's Third New International Dictionary* 477 (1981). In this case, the Library perceived a real or apparent conflict between a convention delegate's private interest in the success of the nominated candidates and the adopted party platform, on the one hand, and each CRS Analyst's official responsibility to avoid partisanship. Nor does the law limit "conflict of interest" to a financial interest; "[t]he term 'conflict of interest' bespeaks a situation in which regard for one duty tends to lead to disregard of another." *United States v. Miller,* 463 F.2d 600, 602 (1st Cir.1972), *cert. denied,* 409 U.S. 956, 93 S.Ct. 300, 34 L.Ed.2d 225 (1972).

Clearly the "conflicts of interest" proscribed by the regulations are not limited to pecuniary dimensions. The history and language of the regulations themselves and the generally accepted meaning of the term "conflict of interest" all lead us to conclude that the Library did not exceed the scope of its regulations in applying LCR 2023–7 to ban an Analyst's participation as a voting delegate at a partisan political convention. The facial constitutionality of such an interpretation is a separate matter. And its constitutionality as applied to Mary Ann Keeffe in the circumstances of this case raises difficulties of

fair notice over and above those raised by the facial terms of the policy. We reach those issues in turn.

## C. *Facial Challenges to the Regulation*

The plaintiffs assert that the guidelines in the Gude Memorandum violate the first amendment rights to freedom of expression and political association. They also assert that the guidelines are vague and therefore violate the due process clause of the fifth amendment.

### 1. *First amendment*

■ It is beyond dispute that participation at a political convention is a political activity protected by the first amendment. *See Buckley v. Valeo,* 424 U.S. 1, 14–15, 24–25, 96 S.Ct. 612, 632, 637, 46 L.Ed.2d 659 (1976); *United States Civil Service Comm'n v. National Ass'n of Letter Carriers (Letter Carriers),* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973); *United Public Workers v. Mitchell,* 330 U.S. 75, 94–95, 67 S.Ct. 556, 566–67, 91 L.Ed. 754 (1947). However, this right is not absolute. *See Buckley v. Valeo,* 424 U.S. at 25, 96 S.Ct. at 637; *Letter Carriers,* 413 U.S. at 567, 93 S.Ct. at 2891. Governmental interference with the right to join in the political process is constitutional if the interference furthers a sufficiently compelling governmental interest, and interferes with the exercise of the right in a manner "closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley v. Valeo,* 424 U.S. at 25, 96 S.Ct. at 637 (upholding limitations on amount of political contributions to, but not on amount of expenditures by, political candidates).

The government's interest in restricting the political activities of congressional employees lies in "promoting the efficiency of the public services it performs through its employees." *Letter Carriers,* 413 U.S. at 564, 93 S.Ct. at 2890 (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). More specifically, the Library's interest is

in guaranteeing the impartiality and the appearance of impartiality projected by the signed work and the professional conduct of its CRS Analysts. The Library's manual for new employees states this interest succinctly:

> [A]ll of these caveats add up to two things: accuracy and detachment.... Congress must have some place in Washington which it can trust, which has no axe to grind, which can produce material to be relied on without question. We now have that reputation. We must be absolutely certain it is not threatened.... We must retain the respect of *all* Members, on all sides of an issue. We work equally for *all* Congressmen and Senators, their staff, and committee staff and all must have confidence that when you assist them, you do so with your knowledge of your field, not from your convictions of "what ought to be done."

C. Goodrum, *Your Work in the Congressional Research Service: An Introductory Operating Manual* 5–6 (1977) (emphasis in original).

It is worth emphasizing that the Library's regulation restricts only the exercise of first amendment rights in ways that impinge on employees' official duties. The regulation, for example, does not and constitutionally could not seek "to control political opinions or beliefs, or to interfere with or influence anyone's vote at the polls." *Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2890. But it is inescapable that some off-duty activities of a public servant are incompatible with the undivided loyalty and integrity that the person must show on behalf of her client or constituency. We note in passing that most codes of judicial ethics restrict the extra-curricular activities of judges, and a code of government ethics says there are some contacts with the private sector which members of the executive branch may not have. While these examples obviously have no direct bearing on the restrictions here, they illustrate the underlying principle that particular restrictions on a government employee's outside activities may be justified because of that

person's official duties. The regulation in this case speaks to safeguarding the impartiality and value of the work product and services that CRS Analysts render to Congress and its members.

■ Given the Library's need to preserve congressional confidence in its Analysts and in their impartiality, the regulation is properly framed to carry out its conflict-of-interest standard. The Court has held in a closely analogous situation that federal employees may be prohibited from serving as a delegate to a political convention. In *Letter Carriers*, federal employees, an employees' union, and local political committees challenged the Hatch Act's prohibition against federal employees of the executive branch taking "an active part in political management or in political campaigns." 5 U.S.C. § 7324(a)(2). The Supreme Court upheld the prohibition, concluding that Congress has the authority to bar partisan political conduct by federal employees. 413 U.S. at 556, 93 S.Ct. at 2886. The Court noted the importance of limiting both the extent of executive branch employees' influence on the electoral process, and the reciprocal influence on the electoral process, and the reciprocal influence of politics on federal service. *Id.* at 557, 93 S.Ct. at 2886. Executive branch employees "should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. *Id.* at 564–65, 93 S.Ct. at 2890. Moreover, they have a duty to enforce the law "without bias or favoritism for or against any political party or group or the members thereof." *Id.* at 565, 93 S.Ct. at 2890. The Court concluded that forbidding partisan political activities promotes both of these objectives, and also preserves public confidence in the integrity of government.

Analogous and equally compelling justifications for limiting the political activities of government employees apply to CRS Analysts. Nonpartisanship on the part of CRS Analysts enables them to serve all Members of Congress effectively and to carry

out Congress' mandate that the Service render advice "without partisan bias." Avoiding political activities may also prevent erosion of congressional and public confidence in the integrity of the Service. As the Supreme Court noted in *United Public Workers v. Mitchell*, 330 U.S. 75, 103, 67 S.Ct. 556, 571, 91 L.Ed. 754 (1947), "Congress and the administrative agencies have authority over the discipline and efficiency of the public service. When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required." Congress and its agency reasonably perceived a need to act to preserve the integrity of CRS Analysts' function within the Congress. The Library's resulting prohibition on Analysts' attendance at political conventions is therefore constitutionally permissible.

## 2. *Vagueness*

■ Plaintiffs also argue, and the district court agreed, that the Library's regulation is unconstitutionally vague on its face and therefore violates their due process rights under the fifth amendment. A statute or ordinance is vague either if it does not give fair warning of the proscribed conduct or if it is an unrestricted delegation of power that enables enforcement officials to act arbitrarily and with unchecked discretion. *See Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 117 (D.C.Cir.1977). As the Supreme Court has held, "[w]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972) (footnotes omitted).

■ We think that the Library's regulations, on their face, are clear enough to provide fair warning to a CRS Analyst considering participation at a political convention that such activity may result in disciplinary action. In *Letter Carriers*, the Court rejected a vagueness challenge to the Hatch Act prohibition on political campaigning. Published guidelines of the Civil Service Commission specifically provided that "Candidacy for or service as delegate, alternate, or proxy in any political convention is prohibited." *Letter Carriers*, 413 U.S. at 573 n. 18, 93 S.Ct. at 2895 n. 18. The Gude memorandum is similarly precise—it states unequivocally that such conduct presents an actual or apparent conflict of interest with Library duties and accordingly is proscribed. There is no ambiguity. We emphasize that *Letter Carriers* is valuable precedent because it defines the degree of precision in a regulation that meets constitutional requirements. Even though the specific statute in that case is inapplicable here, the degree of precision required by *Letter Carriers* applies whenever a regulation has been validly promulgated under an enabling statute.

Second, the Library's review process provides reasonably defined standards. The Library may forbid only those activities of the Analyst or other employee that threaten the employee's actual or apparent impartiality. In this connection, the existence of an administrative procedure within the Library is a significant safeguard. *See* LCR 2023–8. The Library's regulations establish a procedure for the submission of information on situations creating a potential conflict of interest to the General Counsel, who decides the matter and, if necessary, recommends to the Librarian the appropriate remedial action. *Id.* at section 4. The staff member herself may request a decision. *Id.* at section 2(A). Whether self-initiated or initiated by others, this review procedure enables the employee to resolve any ambiguity about the reach of the regulation and to decide whether it will be applied to her proposed conduct. *See Letter Carriers*, 413 U.S. at 580, 93 S.Ct. at 2897.

### III. APPLICATION OF THE LIBRARY'S REGULATION TO MARY ANN KEEFFE

██ Because the regulation on its face is constitutional, the legality of the Library's actions turns on the application of the regulation to Keeffe in this case. We examine whether Keeffe had fair notice, at the time she left for the Democratic Convention in New York, that her service as a delegate was legitimately proscribed because it conflicted with her professional duty. We conclude from a review of the Library's enforcement procedures, both before 1980 and in the weeks leading up to the Convention in 1980, that Keeffe was denied this constitutionally mandated fair notice. The Library failed to provide her with reasonable warning of its new interpretation of the conflict-of-interest regulations. Keeffe could reasonably have concluded from her attendance at the 1974 Mid-term Convention and from the ambiguous signals she received in July and early August 1980 that the regulations were consistent with or at least did not proscribe her attendance.

We consider Keeffe's position in 1980. Before she proposed to attend the 1980 Convention, she could reasonably rely on section 3(A)'s permission to attend the Convention. She knew that she had been allowed to attend the 1974 Democratic National Mid-term convention. Between 1972 and July 1980, no request for clearance by the General Counsel's office of a proposed partisan political activity by an employee of any department of the Library, including CRS, had ever been rejected. *See* Memorandum from John J. Kominski, General Counsel, to Jack Maskell, CREA Representative for Keeffe (Apr. 16, 1981). These opinions had all been rendered informally, in telephone conversations between the employee and the General Counsel's office.

Thus, as the summer of 1980 began, Keeffe had no reason to believe that her attendance at the political convention would subject her to discipline. In light of this background, the Library's course of dealing with her in the summer of 1980 was insufficient to place Keeffe on notice that the prior interpretation had changed.

The entire negotiations on the matter consisted of these vignettes: 1) Cole told her there are significant questions about the propriety of her attendance, and requested an explanation; 2) Gude and Cole referred the matter to the General Counsel; 3) a General Counsel staff member agreed with Gude and Cole; and 4) the General Counsel's opinion letter was read to the daughter of Keeffe's housekeeper over the telephone. When her annual leave began, she had not received formal notice through normal channels that her attendance at the Convention would subject her to discipline.

On the eve of her departure for the Convention, therefore, Keeffe had not received the constitutionally mandated "reasonable opportunity to know what is prohibited," *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298, that was necessary in order for her to conform her conduct to law. She knew only of the Library's permissiveness toward employee political activities, including her own. The Library offers no persuasive reason for waiting until the very last minute to announce that her attendance at the Convention would subject her to an adverse action; no legitimate purpose was served by its delay. In light of the Library's past policy and its failure to render a timely ruling by its General Counsel, Keeffe's receipt of a second-hand, verbal message from her housekeeper's ten-year-old daughter that she should not attend the Convention was legally insufficient to cure this lack of fair notice. Keeffe cannot be required to infer from the abbreviated bulletin she did receive that it represented a change in official Library policy. Nor did the Library's telephone message, left on the eve of her departure for the Convention, afford her adequate opportunity to change her course of conduct by arranging for another delegate to attend the Convention in her place. Accordingly, because Keeffe was denied fair notice of the Library's new policy against Analysts' attendance at political conventions, we affirm the District Court's ruling that the Library's adverse action against her must be overturned.

## IV. REMEDY

The District Court's grant of declaratory and injunctive relief against the prospective application of the Library's conflict-of-interest regulation is vacated. CRS' regulations are not a triumph of careful drafting, but the agency need not discard them. They create a commendable, non-binding presumption that an employee's proposed off-duty political activities are permissible. Nor must the Library promulgate detailed interpretations specifying which political activities fall outside that presumption and require pre-clearance. We do not require that CRS announce in advance, for every conceivable set of facts, whether permission will be granted or denied. The Library, of course, *may* spell out its interpretations in advance. What the Library *must* do is give loud and clear advance notice when it does decide to interpret a particular regulation as a prohibition or limitation on an employee's outside activity. Without this notice, an employee is entitled to read the Library's overly long silence as assent. Therefore we affirm the District Court's order of declaratory and injunctive relief in favor of Keeffe.

## V. CONCLUSION

Congress has imposed high standards of impartial and objective service upon its Congressional Research Service Analysts, both in the discrete tasks they perform and in the appearance their total professional and political profiles present to their clients and to the public. The Library of Congress, drawing on this statutory mandate, now interprets its conflict of interest regulations to prohibit any Analyst's future participation as a delegate at a national partisan political convention. We find no constitutional violation in this interpretation, and we accord the Library the latitude properly extended to the servant of a coordinate branch of government in the performance of its public duties. We leave the Library free to adopt those interpretations that permit and even encourage the widest possible participation of its employees in public life. Accordingly, we reverse the judgment of the District Court that the Library's prospective application of its conflict-of-interest regulations violated the Constitution. All Analysts now have fair notice that their positions of responsibility to Congress and to the public may require them to forego some political activities, specifically attendance at political conventions as delegates.

Our holding today is narrow and does not dictate the direction the Library's interpretations must take. We hold that the Library could not enforce its novel interpretation of a dormant conflict-of-interest regulation against Mary Ann Keeffe because it failed to provide her with constitutionally mandated fair notice of the consequences of her attendance at the political convention. We therefore affirm the judgment of the District Court as to plaintiff Keeffe. Surprise, in this instance, was unpleasant, unfair, and unconstitutional.

*It is so ordered.*