# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 10, 2011          Decided June 1, 2012

No. 11-5092

MORRIS D. DAVIS,
APPELLEE

v.

JAMES H. BILLINGTON, IN HIS OFFICIAL CAPACITY AS THE
LIBRARIAN OF CONGRESS,
APPELLEE

DANIEL P. MULHOLLAN, IN HIS INDIVIDUAL CAPACITY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00036)

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs were *Tony West*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Thomas M. Bondy*, Attorney.

*Aden J. Fine* argued the cause for appellee. With him on the brief were *Alexander A. Abdo*, *Arthur B. Spitzer, and Frederick V. Mulhauser*.

*Louis Fisher* and *Morton Rosenberg*, appearing pro se, were on the brief as *amici curiae* Dr. Louis Fisher and Morton Rosenberg in support of appellee.

Before: SENTELLE, *Chief Judge*, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Dissenting opinion filed by *Circuit Judge* ROGERS.

SENTELLE, *Chief Judge*: Appellee, a former employee of the Library of Congress, brought this action against, *inter alia*, his former supervisor, Daniel Mulhollan, alleging that his termination for publication of articles critical of high-level public officials violated the First and Fifth Amendments of the Constitution and entitled him to damages relief under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Appellant Mulhollan moved to dismiss, arguing that a *Bivens* action is not available under the circumstances of this case and that he is entitled to qualified immunity. The district court denied the motion to dismiss, and Mulhollan filed the current appeal. Because we conclude that the courts should not imply a new form of *Bivens* action on the facts of this case, we reverse the order of the district court denying dismissal.

## I. Background

Upon review of a district court's ruling on a motion to dismiss, we, like the district court, accept as true the well-pleaded factual allegations of the complaint. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). Therefore, the following recitation of facts implies no decision on our part as to the accuracy of the allegations. In December

2008, the Congressional Research Service (CRS), the public-policy-research arm of Congress and a department of the Library of Congress, hired appellee Davis as Assistant Director of its Foreign Affairs, Defense, and Trade Division subject to a mandatory, one-year probationary period. That division provides research and analytical services to congressional committees responsible for foreign affairs; international trade and finance; defense policy and arms control; and defense budget, manpower, and management. As Assistant Director, Davis was responsible for leading, planning, directing, and evaluating the research and analytical activities of the division.

During his tenure as Assistant Director, Davis publicly criticized the system of military commissions created to prosecute suspected terrorists held at Guantanamo Bay Naval Base, Cuba, a system with which he had become familiar while serving as Chief Prosecutor there until October 2007. While employed by CRS, Davis voiced his criticisms of the system at a Human Rights Watch dinner, in a BBC documentary, at a conference at Case Western Reserve University Law School, and in a law review article in connection with the conference. He also spoke about his views at a Lawyers Association of Kansas City meeting after accepting an award for speaking out against what he characterized as the politicization of the military-commissions system.

On November 11, 2009, as Davis's probationary year neared its end, he published opinion pieces in both the Wall Street Journal and the Washington Post criticizing Attorney General Eric Holder and the Obama administration for choosing to prosecute some Guantanamo detainees in federal courts and others in military commissions. Davis called this decision "a mistake" and "double-standard justice" that "we would condemn if … applied to us." The Post piece challenged the contention of former Attorney General Michael Mukasey that "the decision

to try Guantanamo detainees in federal courts comes down to a choice between protecting the American people and showcasing American justice." Davis wrote that Mukasey's statement, which expressed concern for the security of people where detainees would be tried, was "fear-mongering worthy of former vice president Dick Cheney." Neither editorial included a disclaimer that it represented Davis's personal views and not those of CRS or the Library of Congress.

The evening before the publication of the two opinion pieces, Davis e-mailed appellant Mulhollan, the Director of CRS, and informed him of the impending publication of the two opinion pieces. Mulhollan responded by e-mail, questioning Davis's judgment and his ability to continue serving as Assistant Director. After the pieces were published, Mulhollan told Davis that the opinion pieces damaged Davis's ability to lead his division in providing objective, nonpartisan analysis. He also asked how members of Congress could trust Davis's leadership on military-commissions issues given his public opposition to current policy; how Republicans would view his objectivity after his attack on Dick Cheney; and how Davis could properly counsel employees who failed to comply with the CRS outside-speech policy, which Mulhollan believed Davis had violated. On November 20, 2009, Mulhollan notified Davis that he would be removed from his probationary appointment as Assistant Director. Mulhollan provided Davis with a thirty-day appointment as Mulhollan's special advisor to provide time to look for other employment, after which time Davis was separated from CRS.

Davis then filed the current action against appellant, as well as James Billington, the Librarian of Congress, seeking declaratory and injunctive relief, and seeking damages against Mulhollan for violation of his constitutional rights under the First and Fifth Amendments, asking the court to imply a remedy

under *Bivens*. Mulhollan moved to dismiss, both on the basis of qualified immunity and on the theory that the court should not imply a *Bivens* remedy for the discharge of a civil-service employee. Because we agree that there is no available *Bivens* remedy, we will not reach the question of qualified immunity but will reverse the district court's denial of the motion to dismiss.

## II. Analysis

We have jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. It is a well-established application of that doctrine that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Because the defense of qualified immunity from a *Bivens* damages action "directly implicate[s]" the antecedent question whether to recognize that *Bivens* action at all, our jurisdiction extends to that question as well. *See Wilkie v. Robbins*, 551 U.S. 537, 549 & n.4 (2007) (internal quotation marks omitted). We review the district court's legal conclusions *de novo*. *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008).

## A.

In *Bivens*, the Supreme Court determined that under appropriate circumstances the federal courts possess the discretion to create remedial actions against federal officials for violations of constitutional rights, even though Congress has not expressly authorized those specific remedies by statute. *See Bush v. Lucas*, 462 U.S. 367, 373–74 (1983). Beginning with *Bivens*, the Supreme Court has drawn upon this power in three instances to create a nonstatutory action for money damages

against federal officials for constitutional violations. *See Bivens*, 403 U.S. 388 (Fourth Amendment violation by federal agents); *Davis v. Passman*, 442 U.S. 228 (1979) (employment discrimination in violation of the Due Process Clause); *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment violations by prison officials).

For the most part, though, the Court has "responded cautiously" to requests for new "*Bivens*" remedies. *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988). The decision whether to recognize a new damages remedy is not about ensuring that every violation of a constitutional right is vindicated. Rather, the *Bivens* inquiry is a "judgment about the best way to implement a constitutional guarantee." *Robbins*, 551 U.S. at 550. As the Supreme Court has made clear, in most instances the judgment has been that Congress, not the judicial branch, is in the best position to prescribe the scope of relief available for the violation of a constitutional right. The Supreme Court has applied this analysis in a context paralleling the facts before us. Specifically, the Court in *Robbins* stated: "We have accordingly held against applying the *Bivens* model to claims of First Amendment violations by federal employers . . . ." 551 U.S. at 562 (citing *Bush*, 462 U.S. 367); *see also Chappell v. Wallace*, 462 U.S. 296 (1983); *United States v. Stanley*, 483 U.S. 669 (1987); *Chilicky*, 487 U.S. 412. In explaining its reluctance to create new causes of action for federal employees alleging violation of their constitutional rights, the Supreme Court recognized that "Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service." *Bush*, 462 U.S. at 389. The Court further explained that Congress has "developed considerable familiarity with balancing governmental efficiency and the rights of employees," and that "it also may inform itself through factfinding procedures such as hearings that are not available to the courts." *Id.*

In keeping with the Supreme Court's recognition of Congress's primary role, we have held that the courts will not imply a *Bivens* remedy where Congress has adopted a "comprehensive remedial scheme." *Wilson*, 535 F.3d at 705. In *Wilson*, we followed the approach established by the Supreme Court in *Bush v. Lucas*, a case in which a NASA rocket scientist sought damages for First Amendment violations based on an alleged retaliatory demotion. The Court held that the statutory scheme governing federal civil-service employees—"an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations"—qualified as a special factor that precluded creation of a *Bivens* remedy for violations of a federal employee's First Amendment rights. *Bush*, 462 U.S. at 388–89. Although the existing scheme did not afford complete relief to the plaintiff, the scope of relief Congress chose to implement in that system reflected a congressional policy judgment "informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy" to the civil-service system. *Id.* at 388. Recognizing that "Congress is in a far better position than a court" to make that policy judgment, the Court "decline[d] to create a new substantive legal liability without legislative aid and as at the common law." *Id.* at 389–90 (internal quotation marks and citations omitted). In declining to fashion a new *Bivens* remedy, the Court in *Bush* explained that the relevant question about a comprehensive remedial scheme for purposes of special-factors analysis—whether the scheme represents an informed congressional judgment about what relief should be available—"cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff." *Id.* at 388.

8

The Court again dealt with the topic of a comprehensive scheme constituting a special factor in a *Bivens* analysis in *Schweiker v. Chilicky*. In *Chilicky*, the Court made it even clearer that whether the scheme affords a plaintiff relief for his specific injuries is not determinative of this inquiry. The plaintiffs in *Chilicky* sought money damages against state and federal officials for violations of their due process rights that resulted in the termination of the plaintiffs' Social Security disability benefits. The Social Security Act provided no separate remedy for unconstitutional conduct that leads to the wrongful denial of benefits. Yet the Court declined to create a *Bivens* remedy to relieve these unredressed injuries, discerning no relevant distinction between the civil-service system in *Bush* and the Social Security Act's remedial scheme. *Chilicky*, 487 U.S. at 424–25. Indeed, "The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Id.* at 421–22. To the contrary, so long as "the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration," the Court would not add a *Bivens* remedy to the mix. *Id.* at 423. Again, deference to the informed judgment of Congress was the key: "Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program," and it fulfilled that charge. *Id.* at 429. Congress's choice to leave the remedy sought by the plaintiffs out of that complex program was not a legal basis for judicially revising Congress's considered policy judgment. *Id.*

In *Wilson*, as we had earlier done in *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988), we applied the Supreme Court's precedents from *Chilicky* and *Bush*. Although in both *Wilson* and *Spagnola* the comprehensive remedial scheme did not

provide the relief the plaintiff was seeking, "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." *Spagnola*, 859 F.2d at 227. At bottom, then, "courts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Id.* at 228. The presence of these indicia of an informed congressional judgment is sufficient to stay the judiciary's hand in favor of Congress's decision. Because the CSRA met these requirements, the *Spagnola* Court held that "the creation of a *Bivens* remedy for civil service employees and applicants who advance constitutional challenges to federal personnel actions," *id.* at 230, was foreclosed, even though the remedies available to the plaintiffs were "not so complete," *id.* at 226.

*Wilson v. Libby* explicitly rejected the notion that a comprehensive scheme must include some remedy for the plaintiff before the scheme can constitute a special factor that precludes creation of a *Bivens* remedy. A CIA employee, Valerie Plame Wilson, and her husband, Joseph Wilson, brought a *Bivens* action against then-Vice President Cheney, his Chief of Staff, and the President's Deputy Chief of Staff based on alleged improper disclosure of information by those individuals. The disclosure blew Mrs. Wilson's cover as a CIA operative. The Wilsons alleged a violation of Mr. Wilson's free speech rights based on retaliatory disclosure of the information; violations of both his and Mrs. Wilson's equal protection rights; a violation of her right to privacy based on the public disclosure of her personal information; and a violation of her Fifth Amendment property rights based on the disclosure's effective elimination of her position through destruction of its secrecy.

None of these claims were cognizable under the Privacy Act. Mrs. Wilson's claims were barred by the Privacy Act's exemption of the Offices of the President and Vice President—which included the three defendants—from its coverage. The Act provided Mr. Wilson with no relief at all; only the person whose records are actually disclosed may bring a claim under the Privacy Act. Still, we declined to create a *Bivens* remedy for these alleged constitutional violations. We first pointed out that the Wilsons' contention that they had no possibility of relief was inaccurate because Mrs. Wilson had a possible claim against the Deputy Secretary of State. Even if they were correct that the Act provided at least Mr. Wilson with no relief whatsoever, they were incorrect to "focus on the necessity of a remedy at all." *Wilson*, 535 F.3d at 709. We reiterated that "[t]he special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue." *Id.* Instead, the correct inquiry continues to be the one put forth in *Bush*: "the question of who should decide whether such a remedy should be provided." *Id.* (citing *Bush*, 462 U.S. at 380 (internal quotation marks omitted)). Deference to Congress to make that decision is "especially due" when it "intentionally withheld" a remedy, which shows "the considered judgment of Congress that certain remedies are not warranted." *Id.* That deference is owed "whether Congress has chosen to exclude a remedy for particular claims, as in *Bush* and *Chilicky*, or from particular defendants," as was the case in *Wilson*. *Id.*

## B.

### 1.

The primary question before us in this case then is whether the CSRA is a "comprehensive remedial scheme," *i.e.*, a scheme

that reflects a considered congressional judgment about which remedies should be available for claims that fall within its ambit. It qualifies as such "when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Spagnola*, 859 F.2d at 228. That being established, we give "appropriate judicial deference" to Congress's judgment on the matter, treating the comprehensive scheme as a special factor that precludes the creation of a *Bivens* remedy. *Chilicky*, 487 U.S. at 423.

No one contests that the CSRA is a "comprehensive system to administer public rights." Davis admits this much, and indeed, that conclusion was necessary to this court's holding in *Spagnola* that the CSRA was a special factor precluding the creation of a *Bivens* remedy for the plaintiffs in that case. *See Spagnola*, 859 F.2d at 228; *see also Bush*, 462 U.S. at 385–86. Nor has Congress provided any suggestion, much less a "plainly expressed" intent, that *Bivens* remedies should be preserved for claimants in Davis's shoes.

Further, Congress's choice to omit damages remedies for claimants in Davis's posture was a deliberate one—or as we have put it before, Congress has "not inadvertently" omitted these damages remedies. A review of the CSRA's remedial scheme as it relates to Davis and most other civil-service members not employed by an agency under the executive branch for purposes of the CSRA makes it clear that their general excision from the remedial protections available through that scheme was in fact conscious and "not inadvertent."

The CSRA defines the "civil service" as "all appointive positions" in all three branches of government. 5 U.S.C. § 2101. The civil service is then divided into three categories: the Senior

Executive Service, the competitive service, and the excepted service. The Senior Executive Service includes certain high-level executive positions. *See id.* § 3132(a)(2). The competitive service, generally speaking, includes "all civil service positions in the executive branch," excluding positions that require Senate confirmation and those Congress specifically excludes by statute. *Id.* § 2102. It also includes positions in certain named categories if Congress specifically includes any particular positions in those categories by statute. *Id.* Finally, the excepted service contains the remainder of the civil-service positions—those positions not in the competitive service or the Senior Executive Service. *Id.* § 2103.

Congress plainly included employees in Davis's former position in the "civil service" as defined by the CSRA. Davis was an appointed employee with CRS, part of the Library of Congress. The Library of Congress is not in the executive branch for purposes of § 2102, nor are Library of Congress employees specifically included in the competitive service by statute. Therefore, within the CSRA's definitional structure, Davis was a member of the excepted service.

Congress deliberately included Library of Congress employees in the "civil service" governed by the CSRA. Then, just as deliberately, Congress chose to limit the beneficiaries of the CSRA's remedial protections in large part to non-probationary employees in the executive branch. Specifically, three chapters of the CSRA govern personnel actions taken against civil-service employees and the remedies available to those employees. With only inconsequential exceptions, none of them provide procedural rights or remedial measures for civil-service employees of non-Executive agencies, which include the Library of Congress. Moreover, the primary set of protections against arbitrary adverse employment actions, contained in Chapter 75, is not available to employees who are

on probationary status. This leaves Davis, an employee of the Library of Congress on probationary status, without recourse under the CSRA for adverse actions taken against him.

In each of the three CSRA chapters governing personnel actions, the unambiguous language Congress used to delineate which civil-service employees would be eligible for the remedial protections provided demonstrates that the exclusion of probationary and CRS employees was deliberate. First, under Chapter 43, Congress provided procedural protections and rights of appeal in the context of performance reviews to "employees," which are defined in Chapter 43 as individuals "employed in or under an 'agency.'" *Id.* § 4301(2). "Agency" is in turn defined in Chapter 43 as "an Executive agency" and the Government Printing Office (GPO), excluding certain entities not pertinent here. *Id.* § 4301(1). These definitions reflect an intentional choice to leave civil-service members not employed by the statutorily referenced Executive agencies—including employees of CRS, *see id.* § 7103(a)(3) (listing the Library of Congress separately from "Executive agency")—ineligible for these remedial protections.

Chapter 75 of the CSRA, which governs adverse actions taken against civil-service employees for the "efficiency of the service," excises probationary and non-Executive agency employees from its procedural protections in similar fashion. The protections available to civil-service members for minor adverse actions (suspensions shorter than 14 days) are limited to "employees," which are defined as individuals in the competitive service not on probationary status. *Id.* § 7501(1). The protections against major adverse actions (removal, longer suspensions, pay or grade reduction, or furlough) are also limited to "employees," which are defined more broadly under that subsection as (A) members of the competitive service not on probationary status; (B) preference-eligible members of the

excepted service who have served at least a year in an Executive agency (or in the Postal Service or the Postal Regulatory Commission); or (C) non-preference-eligible, non-probationary members of the excepted service who have served two years or more in an Executive agency. *See id.* § 7511(a)(1). These carefully crafted definitions set up clear demarcations between the categories of civil-service members eligible and ineligible for the CSRA's main body of procedural protections against adverse employment actions, and the ineligible group includes excepted-service employees of non-Executive agencies and probationary employees.

Chapter 23, which establishes the principles of the merit system of civil-service employment, forbids an agency from engaging in certain "prohibited personnel practices," *id.* §§ 2301–02. Each section is limited almost exclusively to employees of Executive agencies using an approach nearly identical to that used in Chapter 43. The section listing the basic principles of the merit system applies to "an Executive agency" and the Government Printing Office. *Id.* § 2301. The section listing the specific prohibited personnel actions defines "personnel action" as an action "with respect to an employee in, or applicant for, a covered position in an 'agency,'" which is again defined as an Executive agency and the Government Printing Office (excluding government corporations, intelligence agencies, and the Government Accountability Office). *Id.* § 2302.

The careful categorization of the subsets of civil-service employees eligible for each part of the CSRA's remedial scheme speaks for itself—Congress's decisions about which civil-service members would be eligible for these protections were not made inadvertently. Our discussion of the same inquiry in *Wilson* reflects this. There, we held that Congress was aware that the definition of "agency" it chose would exclude the

Offices of the President and Vice President from the Privacy Act's disclosure requirements (leaving the Wilsons without claims against the three defendants, who were employed with those offices). That awareness was sufficient to deem the omission "intentional" and "not inadvertent." *Wilson*, 535 F.3d at 708. Here, the unambiguous use of the narrowing term "Executive agency"—a term which plainly does not contain the Library of Congress within the meaning of the statute, *see* 5 U.S.C. § 7103(a)(3)—and the express exclusion of probationary employees from the "agencies" and types of "employees" subject to the CSRA's remedial protections evidences an explicit congressional design for the subsets of civil-service employees that would and would not have access to those protections. We are satisfied that Congress omitted the subset of employees that includes Davis from the remedial protections of the CSRA every bit as intentionally as it omitted the Offices of the President and Vice President from Privacy Act requirements in *Wilson*. And as we wrote in *Wilson*, "it is where Congress has intentionally withheld a remedy that we must most refrain from providing one because it is in those situations that 'appropriate judicial deference' is especially due to the considered judgment of Congress that certain remedies are not warranted." *Wilson*, 535 F.3d at 709 (citing *Chilicky*, 487 U.S. at 423).

In short, all indications suggest Congress has made an informed judgment about which remedies should be available to particular classes of civil-service employees. The CSRA is a comprehensive system to administer public rights; Congress consciously, "not inadvertently" omitted remedies for civil-service members employed in or under the Library of Congress; and nothing suggests Congress intended that courts preserve *Bivens* remedies for such claimants. These indications are sufficient to require our deference to Congress as "the body charged with making the inevitable compromises required in the design of a massive and complex . . . program." *Chilicky*, 487

U.S. at 429.

2.

Davis's argument to the contrary rests on the idea that in no other case has the Supreme Court or this court refused to recognize a *Bivens* remedy for a plaintiff based on the existence of a remedial scheme that provides no relief whatsoever for the alleged constitutional violations.  This is incorrect.  To begin with, the *Chilicky* plaintiffs sought a *Bivens* remedy against state and federal officials for "emotional distress and for loss of food, shelter and other necessities proximately caused by [the officers'] denial of [disability] benefits without due process." 487 U.S. at 419 (internal quotation marks omitted).  The Act "makes no provision for remedies in money damages against officials responsible for unconstitutional conduct that leads to the wrongful denial of benefits."  *Id.* at 424.  Even so, the Supreme Court rejected the *Bivens* request because the Social Security Act provided a multi-step process for review of disability claims.

*Wilson* is even more to the point.  The Privacy Act provided no relief for the claims of either Mr. or Mrs. Wilson against the three officers they sued for disclosing the fact of Mrs. Wilson's CIA employment.  The Act only offered a "possible claim" by Mrs. Wilson against a defendant not named in the lawsuit. *Wilson*, 535 F.3d at 709.  Mr. Wilson had no cognizable claim under the Privacy Act against anyone because the only information disclosed by the defendants was his wife's, meaning only she could bring a claim under the Act.  Yet this court refrained from providing a *Bivens* remedy even to him because "the special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue."  *Id.*  Simply put, this will not be the first time we have rejected a *Bivens* request in light of a

comprehensive statutory scheme that fails to provide for redress of a plaintiff's constitutional claims.

These precedents control the current case. The district court pointed to the CSRA's lack of any review for Davis's alleged constitutional violations as dispositive evidence that the CSRA cannot be considered a "comprehensive" remedial system. But *Chilicky*, *Spagnola*, and particularly *Wilson* are to the contrary. "[C]ase-specific analysis . . . of the particular statutory remedies available to a claimant" is not required; instead, we look to whether the design of a statutory scheme evinces an informed congressional judgment that the remedies provided by the scheme are adequate. *Spagnola*, 859 F.2d at 227–28. If it does, the scheme's failure to provide a remedy to a "particular plaintiff for the particular claim he or she wishes to pursue" does not make the scheme any less "comprehensive" for purposes of determining whether it is a special factor that precludes the creation of a *Bivens* remedy. *See, e.g.*, *Wilson*, 535 F.3d at 709. The *Wilson* plaintiffs made a nearly identical argument, *see id.* at 707. It was as unavailing then as it is now. The Privacy Act's failure to provide complete relief to the Wilsons did not "undermine its status as a 'comprehensive scheme' that stops us from providing additional remedies under *Bivens*." *Id.* Just so, the CSRA's lack of relief for Davis does not prevent it from being a "comprehensive remedial scheme" that precludes us from creating a *Bivens* remedy.

Davis contends that his complete lack of available remedies under the CSRA matters for a slightly different reason. He argues that Congress's omission of any remedies for Library of Congress employees under the CSRA, while deliberate, does not demonstrate a considered judgment about which remedies should be available to those employees; rather, it shows that those employees are not "included in" or "covered by" the concededly comprehensive remedial system at all. This would

mean he could still bring a *Bivens* action, he concludes, because a comprehensive remedial system cannot serve as a special factor barring creation of a *Bivens* remedy for employees who are not "covered" by that system.

This is not a novel theory. It has been framed before as the question "whether a particular claimant—and his underlying claim—should be included in a given congressional 'comprehensive system' for purposes of applying 'special factors' analysis." *Spagnola*, 859 F.2d at 229. For instance, "while in some cases the outer boundaries for inclusion in 'comprehensive systems' may be less than clear," there was "little doubt" that Congress had brought First Amendment claims like those advanced by the *Spagnola* plaintiffs "within CSRA's ambit . . . because the CSRA itself, in one fashion or another, affirmatively speaks to [claims like those] by condemning the underlying actions as 'prohibited personnel practices.'" *Id.* This case is not materially different. Moreover, while the CSRA's remedial scheme does not provide Davis with procedural protections (due to his status as a probationary employee of a non-Executive agency), it does provide procedural protections and rights of appeal for the specific underlying actions he challenges. *See* 5 U.S.C. §§ 4301–03 (providing certain protections to employees of "Executive agencies" removed for unacceptable performance, including advance written notice, a written decision, and the right to appeal to the Merit Systems Protection Board); *id.* §§ 7512–13 (providing similar procedural protections and rights of appeal to employees against whom major adverse employment action is proposed). Both by definition and in substance, then, the CSRA accounts for civil-service members in Davis's status. Congress may have then chosen to make the CSRA's remedial protections for adverse employment actions unavailable to the subset of civil-service members of which Davis is a part, but he has provided us with no good reason to think that this choice is a

signal to create a new *Bivens* remedy for that class of employees and not simply a considered congressional judgment that these remedies for these employees are not warranted.

Indeed, the only evidence Davis uses to suggest he is not "included" in the CSRA's comprehensive remedial scheme is the lack of relief available to him under that scheme. As we have explained above, and as the precedents make clear, this is certainly not a sufficient reason to place a claimant and his claims outside the ambit of a comprehensive remedial scheme for purposes of special-factors analysis. *See, e.g.*, *Wilson*, *supra*. In sum, the CSRA includes a comprehensive remedial scheme evincing a "considered judgment of Congress that certain remedies are not warranted," *Wilson*, 535 F.3d at 709, including the damages remedy Davis seeks for alleged constitutional violations. As we must give "appropriate judicial deference" to that judgment, *id.*, we decline to create a *Bivens* remedy and thereby contravene Congress's choice.[1]

## Conclusion

Because we hold that Davis has failed to state a *Bivens* claim for which relief may be granted, there is no reason to reach the merits of his claims or to consider whether Director Mulhollan is entitled to qualified immunity. We vacate the order of the district court denying Mulhollan's motion to dismiss and remand with instructions to dismiss Davis's *Bivens* claims.

---

[1] Davis can and has filed a claim for injunctive relief for the alleged constitutional violations. We express no view on the validity of that claim. *See, e.g.*, *Spagnola*, 859 F.2d at 229–30.

ROGERS, *Circuit Judge*, dissenting: From the unremarkable fact that Congress was *aware* that it was not including employees of the Legislative Branch in the remedial provisions of the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), the court concludes that "Congress consciously, 'not inadvertently' omitted remedies" for Library of Congress employees, and thus the CSRA precludes a *Bivens*[1] remedy for Col. Morris D. Davis. Op. at 15. The premise of the court's holding is that when Congress enacts a remedial scheme for a specific group of claimants, it is making a conscious decision *not* to enact a remedial scheme for *other* claimants, regardless of how far beyond the intended scope of the enacted scheme those other claimants are, and even in the absence of any evidence demonstrating Congress chose to exclude them *because* it did not want them to have a remedy at all. There is no limiting principle to this theory, and in adopting it, the court allows the "special factor" exception to swallow the rule. The Supreme Court has not gone so far, *see Minneci v. Pollard*, 132 S. Ct. 617 (2012); nor should we.

The court ignores the real question in this case – *why* did Congress exclude Legislative Branch employees? The answer, found in the unambiguous legislative history of the CSRA and the Congressional Accountability Act of 1995, Pub. L. No. 104-1, 109 Stat 3 (codified at 2 U.S.C. §§ 1301–1438), is that Congress, based on separation of powers principles, did not want the Executive Branch to have the power to adjudicate claims of Legislative Branch employees – a motivation that says *nothing* about what Congress intended with respect to Legislative Branch employee *Bivens* claims. Indeed, the legislative history of the Congressional Accountability Act demonstrates that

---

[1] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

Congress expressly concluded that judicial adjudication posed none of the same separation of powers concerns. Because Congress did not "intentionally withhold a remedy," *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008), from Library of Congress employees by enacting the CSRA, and neither it nor the Congressional Accountability Act constitutes special factors counseling hesitation in recognizing a *Bivens* action, I would affirm the district court's ruling that Davis stated a valid *Bivens* claim. Accordingly, I respectfully dissent.

**I.**

In *Bivens*, the plaintiff alleged that federal officials conducted an unlawful search and seizure in violation of the Fourth Amendment to the Constitution, and the Supreme Court held that the federal officials could be sued for violating his constitutional rights, reasoning that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U.S. at 395. To determine whether a complaint states a valid *Bivens* claim, the Court has instructed that the first question is "whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Minneci*, 132 S. Ct. at 621 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)) (alteration in original). Absent an alternative remedy, the question is whether "any special factors counsel[] hesitation before authorizing a new kind of federal litigation." *Id.* (quoting *Wilkie*, 551 U.S. at 550).

One such special factor is where Congress, although not explicitly foreclosing a damages action, has provided "recourse to 'an elaborate, comprehensive scheme,'" *Wilkie*, 551 U.S. at 575 (quoting *Bush v. Lucas*, 462 U.S. 367, 385 (1983)), such that recognition of a *Bivens* action would "interfere with

Congress' carefully calibrated system." *Id.* This is the question presented by the complaint, which alleges that the Librarian and Davis's supervisor violated his First and Fifth Amendment rights under the Constitution when he was fired from his position as Assistant Director of the Foreign Affairs, Defense, and Trade Division, in the Congressional Research Service ("CRS") at the Library of Congress after an article and letter to the editor criticizing the Obama and Bush Administrations' handling of Guantanamo detainee trials were each published in a newspaper.

**A.**

The court views the fact that Library of Congress employees are excluded from the CSRA's remedial scheme for personnel actions, *see* 5 U.S.C. §§ 2301(a), 4301(1), & 7511(a)(1)(B)(i), as evidence that Congress intentionally withheld a remedy from them, and thus the CSRA constitutes a "special factor" precluding a *Bivens* action for Davis. Op. at 11–15. Although the exclusion of Library employees is dispositive in this case, it demands the opposite result. Contrary to the court's conclusion, *see* Op. at 12, the Congress that enacted the CSRA did not "define" the scope of the civil service and then limit remedies to Executive Branch employees in one deliberative, fell-swoop. Instead, more than a decade before enacting the CSRA, Congress enacted the "Definitions" section of Title 5, Chapter 21 of the U.S. Code "to establish a basis of reference" "for convenience" when referring to federal employees. S. REP. NO. 89-1380, at 46–47 (1966); H.R. REP. NO. 89-901, at 26–27 (1966).[2] No evidence suggests that

---

[2] The court concludes that "Congress deliberately included Library of Congress employees in the 'civil service' . . . [t]hen, just as deliberately, Congress chose to limit" the remedial provisions to the Executive Branch, *see id.* at 12. But these definitions were enacted in 1966, twelve years prior to the enactment of the CSRA. *See* Act of

4

Congress intended *anything* about what remedies should be available to Library employees when it enacted the CSRA; it was addressing the altogether different question of how to provide a fair system for adjudicating remedial claims within the Executive Branch civil service. That Library employees are in the "excepted service" as a matter of vernacular convenience adds nothing to the analysis. Congress did not view itself as legislating on what remedies should be available to Library

Sept. 6, 1966, Pub. L. 89-554, §§ 2101–2103; 80 Stat. 378, 408 (1966) (enacting Title 5, United States Code, entitled "Government Organization and Employees"). The legislative history of the 1966 Act indicates that Congress defined the "civil service" to "consist of all appointive positions in the executive, judicial, and legislative branches," 5 U.S.C. § 2101(1) (1966), in order "to establish a basis of reference to employees in this title." S. REP. NO. 89-1380, at 46; H.R. REP. NO. 89-901, at 26. Section 2102 of the 1966 Act, 5 U.S.C. § 2102, defined the "competitive service," with some exceptions not relevant here, as "all civil service positions in the executive branch." This was done simply to reorganize and centralize the Code's definition based on two prior statutes, the Act of Jan. 16, 1883, ch. 27 § 7, 22 Stat. 406 (1883), and the Act of Nov. 26, 1940, ch. 919, title I, 54 Stat. 1211 (1940). *See* S. REP. NO. 89-1380, at 46; H.R. REP. NO. 89-901, at 26. Finally, section 2103 of the 1966 Act, 5 U.S.C. § 2103 (1966), provided that "[f]or purposes of this title, the 'excepted service' consists of those civil service positions which are not in the competitive service." Both the House and Senate Reports of the 1966 Act stated that section 2103 "is supplied for convenience. The 'excepted service' has come to mean all employees not in the competitive service, for whatever reason." S. REP. NO. 89-1380, at 47; H.R. REP. NO. 89-901, at 27. The only modification the CSRA made to the definitions in 5 U.S.C. §§ 2101–2103 was to add provisions regarding the Senior Executive Service, which are not at issue here. *See* CSRA § 401 (codified at 5 U.S.C. §§ 2101a, 2102(a)(1), & 2103(a)).

employees when it enacted the CSRA and it is thus irrelevant to the "special factors" analysis.

*Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002), illustrates this point. In *Stewart*, a federal employee filed a *Bivens* action against her employer for an alleged unlawful search in violation of the Fourth Amendment. *Id.* at 1129. This court reasoned that the CSRA did not preclude the *Bivens* action because "a warrantless search is not a 'personnel action[] . . . covered by this system' and [thus] such a search does not fall 'within the statutory scheme.'" *Id.* at 1130 (quoting *Bush v. Lucas*, 462 U.S. 367, 385 n.28 (1983)). The court noted that "*Bush* virtually compels the conclusion that the [CSRA] does not preclude a *Bivens* action for a warrantless search." *Id. Stewart* thus stands for the proposition that where a claim is outside the scope of a remedial scheme, such that Congress did not envision itself as legislating on the subject of that claim, the remedial scheme does not preclude a *Bivens* action based on that claim.

This principle applies with equal force here, where Davis is a claimant who is outside the scope of the remedial scheme, such that Congress did not envision itself as legislating about the remedies available to that claimant. "The [CSRA] is not concerned with the conduct of which [he] claims," *id.*, that is, violation of constitutional rights of a Legislative Branch employee. *Stewart* reflects the appropriate limiting principle to the proposition that "a comprehensive statutory scheme precludes a *Bivens* remedy even when the scheme provides the plaintiff with no remedy whatsoever." *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008) (internal quotation marks and citations omitted). A specific claimant or a specific claim must be "within the statutory scheme," *Bush v. Lucas*, 462 U.S. 367, 385 n.28 (1983), such that Congress withheld a remedy for the conscious purpose of denying one, in order for the scheme to preclude a *Bivens* action for that claimant or claim.

The Supreme Court's precedent holding that a comprehensive remedial statutory scheme precludes a *Bivens* action reflects this limiting principle. For example, in *Bush*, 462 U.S. at 386, the Executive Branch federal employee's claims were "fully cognizable" by the Civil Service Commission's "elaborate, comprehensive scheme." In *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988), the Social Security disability beneficiaries and their claims were within the "considerably more elaborate," *id.* at 424, remedial scheme enacted by Congress, even though it did not provide "complete relief," *id.* (internal quotation marks and citation omitted). Similarly, in *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 71–73 (2001), the prisoner's claims were covered by "alternative remedies [] at least as great, and in many respects greater, than anything that could be had under *Bivens*." The Court's most recent discussion of *Bivens* in *Minneci*, 132 S. Ct. at 626, adheres to this approach, holding that a federal prisoner in a private correctional facility had no Eighth Amendment *Bivens* claim where the alleged "conduct is of a kind that typically falls within the scope of traditional state tort law."

Until recently, this court has followed suit. For example, in *Spagnola v. Mathis*, 859 F.2d 223, 225 n.3 (D.C. Cir. 1988), the *en banc* court concluded that the constitutional claims of the Executive Branch employees were covered by the CSRA, and thus they were within the scope of the remedial scheme. In *Wilson*, 535 F.3d at 707, the court stated that "each Constitutional claim, whether pled in terms of privacy, property, due process, or the First Amendment, is a claim alleging damages from the improper disclosure of information covered by the Privacy Act." *Id.* *But see id.* at 713 (Rogers, J., dissenting). On the basis of unambiguous legislative history, the court concluded that Congress intentionally excluded the President, Vice-President, and their staffs as possible defendants for Privacy Act claims. *Id.* at 708. I dissented from the court's

holding in *Wilson*, and continue to disagree with its analysis. Yet in *Wilson* the court at least sought to determine, through legislative history, whether Congress acted with the *purpose* of withholding a remedy for claims against such defendants premised on the release of information covered by the Privacy Act. *See id.* In all of these cases, the alternative remedies or the remedial scheme at issue covered either the claimants or their claims, such that they were "within the statutory scheme," *Stewart*, 275 F.3d at 1130 (internal quotation marks and citation omitted), or the court concluded that legislative history demonstrated Congress excluded claims or claimants for the *purpose* of withholding all remedies, and thus a *Bivens* remedy could be precluded.

The court today acknowledges that this limiting principle "is not a novel theory," Op. at 18, but its response misses the point of the principle altogether. The court reasons that Davis's *claim* would be covered by the CSRA, but as a *claimant* he is not, and thus he is not outside the "outer boundary" of the CSRA's scope. *See* Op. at 18–19. Whenever the limiting principle is implicated, either a claim (but not the claimant) or a claimant (but not the claim) will be covered by the remedial scheme; otherwise there would be no need to consider whether the "outer boundary," *Spagnola*, 859 F.2d at 229, of the remedial scheme has been breached. The difficulties arise precisely where one, but not both, is included. Under the court's logic, *Stewart*'s limiting principle would not have applied in *Stewart* itself, where a federal employee (the *claimant*) was covered by the CSRA, but her Fourth Amendment *claim*, premised on work-site actions, was not. The court's analysis restates the obvious fact Davis is not an Executive Branch employee, and from that somehow concludes that there was "a considered congressional judgment that [] remedies for [non-Executive Branch employees] are not warranted." Op. at 18–19. The analysis of whether the limiting principle should apply,

however, depends on *why* Congress excluded either the claimant or the claim. If it acted with the *purpose* of preventing a remedy altogether, then the *Stewart* limiting principle is inapplicable. If it did so for reasons unrelated to a desire to remove all remedies, then *Stewart* applies.

The court does not bother to pose, let alone answer, this question, ignoring that both *Wilson* and *Spagnola* consulted the legislative history of the remedial scheme to ascertain the "outer boundaries for inclusion in 'comprehensive systems,'" *Spagnola*, 859 F.2d at 229. In *Wilson*, the court's determination that the Privacy Act, 5 U.S.C. § 552a, was a "special factor" precluding a *Bivens* action for both Wilsons' claims against the President, the Vice-President, and their staff was based on what the Supreme Court viewed as "'unambiguous' legislative history" that "Congress did not inadvertently omit the Offices of the President and Vice President from the Privacy Act's disclosure requirements." *Wilson*, 535 F.3d at 708 (quoting *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980)). In *Spagnola*, a case involving whether the CSRA precluded a *Bivens* action for constitutional claims of Executive Branch employees, the *en banc* court "f[ou]nd nothing in the legislative history suggesting that Congress' omission of a damages remedy in the CSRA was anything but advertent," 859 F.2d at 229, "nor . . . discern[ed] any clear expression of congressional intent that the courts preserve *Bivens* remedies," *id.* The court noted that "[t]he most that can be said for the legislative history of the CSRA is that Congress did not expressly intend to *eliminate* damages remedies" for Executive Branch employees, observing the "'explicit congressional declaration' exception to allowing damages remedies . . . has little relevance to the 'special factors' exception after *Chilicky*." *Id.* at 229 n.10 (emphasis in original).

The question here is not whether Congress's omission of a damages remedy in the CSRA was advertent, but whether Congress's omission of Library of Congress employees from coverage under the CSRA demonstrates a conscious choice that such employees not have a *Bivens* remedy, or instead whether such employees are simply outside the scope of the question Congress was addressing in enacting the CSRA, making the CSRA irrelevant to the *Bivens* analysis, as it was in *Stewart*. *See* 275 F.3d at 1130. The legislative history of the CSRA demonstrates the latter. In adopting the CSRA, Congress focused on reforming the "civil service system" of the "executive branch." H.R. REP. NO. 95-1403, at 3 (1978), *reprinted in* House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Civil Service Reform Act of 1978, at 640 (Comm. Print 1979). The CSRA thus included "general policies of the merit system principles applicable to the competitive civil service and throughout the executive branch," *id.* at 4, providing guidance for "all Executive agencies to follow," *id.* Congress's plain intent was to reform the employment practices of the Executive Branch.

The legislative history of the CSRA confirms that Legislative Branch employees were excluded from the CSRA's remedial provisions not because Congress wished to express its intent that they have no remedies available, but instead because of separation of powers concerns. During the conference committee mark-up session, the House and Senate Members agreed that the Library of Congress, the Government Accountability Office (also in the Legislative Branch), and the Administrative Office of the Courts (in the Judicial Branch), would not be required to seek allotments of "supergrade" positions from the Office of Personnel Management in the Executive Branch. These offices would "retain the supergrade allocations that they have on the theory that they are not in the Executive Branch and that the President or the personnel

manager for the President should not have the power to shift those supergrades around. The [C]ongress ought to retain that power." The Civil Service Reform Act of 1978: *Joint Conference of the Senate Committee on Governmental Affairs and the House Committee on Post Office and Civil Service*, 96th Cong. 22 (Sept. 26, 1978), *reprinted in* HOUSE-SENATE CONFERENCE MARKUP SESSION ON CIVIL SERVICE REFORM ACT OF 1978, Senate Comm. on Gov't Affairs and House Comm. on Post Office and Civil Service (1978) (statement of Rep. Udall). As one Senate Conferee put it, "we feel so strongly about the separation of powers principle." *Id.* (statement of Sen. Percy).

Although Congress was *aware* it was not extending the CSRA's remedial scheme, which is administered by the Executive Branch, to Library employees, *see* Op. at 11–15, this conclusion is only half the analysis. The *reason* for the exclusion reflected in the legislative history — the protection of the separation of powers — demonstrates that Congress did not view itself as legislating on the subject of what remedies should be available to Library employees, and in excluding Library employees from CSRA coverage did not "intentionally withh[o]ld a remedy," *Wilson*, 535 F.3d at 709. The *Stewart* limiting principle therefore applies in Davis's case.

**B.**

Likewise, the Congressional Accountability Act does not preclude a *Bivens* action in this case.[3] Most of its provisions do

---

[3]    The Congressional Accountability Act, guided by the principle that "Congress should be subject to the same laws as apply to a business back in a home state," S. REP. NO. 103-397, at 6, applied, among other laws, "8 key anti-discrimination and employee-protection laws to the Congress": Title VII of the Civil Rights Act of 1964; The Age Discrimination in Employment Act of 1967; The Rehabilitation Act of 1973; The Americans with Disabilities Act of 1990; The

not apply to the Library of Congress, because "the Library of Congress[4] [was] already covered by antidiscrimination and employee protection laws." S. REP. NO. 103-397, at 2 (1994); 2 U.S.C. § 1302.[5] The House Floor debate indicates that its purpose was to make Congress abide by the same anti-discrimination laws that apply to the private sector, *see, e.g.*, 114

---

Family and Medical Leave Act of 1993; The Fair Labor Standards Act of 1938; The Occupational Safety and Health Act of 1970; and the Federal Service Labor-Management Relations Statute. *Id*. at 6; *see* 2 U.S.C. § 1371(b).

[4] The universal definition of "covered employee" in the Accountability Act does not extend to the Library of Congress, 2 U.S.C. § 1301(3), but various provisions afford Library employees protections under other federal laws. *See id*. § 1314(a)(2) (Employee Polygraph Protection Act of 1988); § 1315(a)(2) (Worker Adjustment and Retraining Notification Act); § 1316(a)(2)(B) (Veterans' Employment and Reemployment); § 1341(a)(2)(D) (Occupational Safety and Health Act of 1970).

[5] Prior to enactment of the Accountability Act, Library employees "enjoy[ed] most of the rights and protection of the antidiscrimination laws, including the right to brings actions in U.S. district court," *id.* at 4, although "enforcement mechanisms [] differ[ed]" from those applicable to Executive Branch employees. Specifically, Congress had previously extended coverage to Library employees of: Title VII of the Civil Rights Act of 1964 (as amended in 1972), *see* 42 U.S.C. § 2000e-16(b), the Age Discrimination Act of 1967 (as amended in 1978), *see* 29 U.S.C. § 633a(a), and the Americans with Disabilities Act of 1990 ("ADA"), *see* 42 U.S.C. § 12209. Consistent with Congress's concern for separation of powers, for Title VII and Age Discrimination Act claims, the Librarian had the powers normally given the Equal Employment Opportunity Commission. *See* 42 U.S.C. § 2000e-16(b); 29 U.S.C. § 633a(b). The Librarian was also authorized to establish remedies and procedures for claims under the ADA. *See* 42 U.S.C. § 12209(2).

12

Cong. Rec. 264-65 (statement of Rep. Goodling, chairman of the House Committee on Economic and Educational Opportunities), and that there was no consideration or rejection of a remedial scheme to address constitutional claims of Library employees – claims that do not exist against private employers. The Senate deliberations of the Congressional Accountability Act demonstrate Congress's consistent concern with protecting separation of powers in managing Legislative Branch employment affairs, supporting the conclusion that both the Accountability Act and the CSRA are irrelevant to the question before the court.

> To authorize executive branch agencies to enforce antidiscrimination and employment laws against Congress would create a dangerous entanglement between these two branches of government. The legislative branch must be free from executive branch intimidation, real or perceived . . . . To maintain the necessary separation of powers, the Committee [on Governmental Affairs] determined that it is essential to maintain independence from the executive branch.

S. REP. NO. 103-397, at 6 (1994).[6]  "On the other hand," in extending judicial review to congressional employee claims,

---

[6]  S. Rep. No. 103-397 accompanied a predecessor bill, H.R. 4822 in the 103d Congress.  In introducing S. 2, the bill that ultimately was enacted, *see* Congressional Accountability Act of 1995, Pub. L. No. 104-1, 109 Stat. 3, 104th Cong., 1st Sess. (1995), the Chairman of the Senate Governmental Affairs Committee, before which the bill was pending, noted that S. 2 did not come to the Senate Floor following the normal committee referral process and "refer[red] Members to [] committee report No. 103-397" for legislative history of the previous bill because S. 2 was "a modified version of H.R. 4822." 141 Cong. Rec. 684 (1995) (statement of Sen. Roth).

> separation-of-powers concerns that make executive-branch enforcement unacceptable are not applicable to [federal] district court actions. Courts and judges do not have the complex interactions with Congress that executive agencies have, so the risk of intimidation would not arise.

*Id.* at 8.[7]

A *Bivens* action cannot sensibly be precluded where Congress has expressed no view whatsoever on what remedies should be available for First Amendment violations and where, in extending remedies for other claims, it has expressed its desire that the judiciary resolve claims. *See* 2 U.S.C. §§ 1404, 1407–09. Although Congress restricted some employment claims from judicial review, it only did so for claims arising under the Accountability Act, which Davis's First Amendment

---

[7] Some House Members would have allowed personal liability suits against Members of Congress for violations of the laws covered by the Accountability Act. *See* 141 Cong. Rec. at 536, (statements of Rep. Goodling & Rep. Fawell). Instead, Congress provided that appropriations may be used as the sole source from which to pay awards or settlements of claims under the Accountability Act, *see* 2 U.S.C. § 1415(a), precluding personal liability by Members of Congress, *see also* 141 Cong. Rec. at 536 ("Members of Congress [shall be] indemnified for any damages, costs, or legal fees to which a prevailing party may be found entitled.") (statement of Rep. Fawell). This approach is consistent with the practical result of *Bivens* actions, where the United States often indemnifies its employees sued pursuant to *Bivens*. *Cf. FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (noting that government expends a good deal of money indemnifying employees); *Cleavinger v. Saxner*, 474 U.S. 193, 208 (1985) ("[A]ny expense of litigation is largely alleviated by the fact that a Government official who finds himself as a defendant in litigation of this kind is often represented, as in this case, by Government counsel.").

claim does not.[8]  Furthermore, Congress's inclusion of a provision in the Congressional Accountability Act calling for a study to determine if the rights, protections, and procedures for Library employees were "comprehensive and effective," 2 U.S.C. § 1371(c), supports the conclusion that Congress had not, in either it or the CSRA, indicated what remedies it thought should be available to Library employees for alleged violations of their First Amendment rights.  The Congressional Accountability Act, therefore, is not a special factor precluding a *Bivens* action by Davis.

## C.

Davis's *Bivens* action also is not precluded by the fact that he was a probationary employee when he was fired.  *See* Appellant's Br. at 58 (citing Library of Cong. Reg. 2020-3.1, § 3(1)(1)); Compl. ¶ 55.  The Library can point to no reason his probationary status should be a "special factor" precluding a *Bivens* action.  The Library's internal regulations and policies

---

[8]  2 U.S.C. § 1410 provides that "[e]xcept as expressly authorized by sections 1407, 1408, and 1409 of this title, the compliance or noncompliance with the provisions of this chapter and any action taken pursuant to this chapter shall not be subject to judicial review."  For example, congressional employees must complete counseling and mediation before seeking judicial remedies.  2 U.S.C. § 1408.  Section 1410 was included to prevent the "circumvention of th[e] Act by such methods as implied statutory, common law, or Constitutional causes of action in either the Judicial or Executive Branch."  H.R. REP. NO. 103-650 (II), at Part II, section 17 (1994).  Because constitutional claims for alleged First Amendment violations are not included as a "provision[] of this chapter," 2 U.S.C. § 1410, Davis's *Bivens* action is not precluded by this section.  *Cf. Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985) (holding that Congress did not intend Title VII to preclude suits "for constitutional violations [of the First Amendment] against which Title VII provides no protection at all").

are not part of the record, nor publically available, and its regulation on providing assistance without partisan bias and policy on outside activities, which are part of the record, do not constitute a "comprehensive scheme" that would preclude a *Bivens* action; neither the Supreme Court nor this court has held the availability of injunctive relief, *see* Op. at 19 n.1, is such a "comprehensive scheme," *see, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 831, 845–47 (1994). Even assuming the brevity of Davis's eleven months' employment at the Library would affect the amount of damages he could recover for a constitutional violation, it does not qualify as a "special factor" suggesting he does not have a remedy.[9] And assuming Library regulations provide for termination of probationary employment for many reasons, Supreme Court precedent is clear that the exercise of free speech rights may not be among those reasons.[10]

---

[9] Contrary to the court's suggestion, *see* Op. at 12–13, in the CSRA Congress provided that probationary Executive Branch employees would have review, through investigation by the Office of Special Counsel, of alleged constitutional violations. *See Castle v. Rubin*, 78 F.3d 654, 658 (D.C. Cir. 1996); 5 U.S.C. §§ 1214(a)(1)(A) & (a)(3); 2302(b)(12) & § 2301(b)(2). This provides further evidence that Congress has not indicated that constitutional violations of probationary employees' rights should be without remedy.

[10] The Supreme Court instructed:

[E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would

16

**D.**

The court observes that "in most instances the judgment has been that Congress, not the judicial branch, is in the best position to prescribe the scope of relief available for the violation of a constitutional right." Op. at 6. In *this* instance, however, Congress (acting through the Library) is the defendant alleged to have violated its employee's constitutional rights. In *Davis v. Passman*, 442 U.S. 228 (1979), a female congressional staffer whose employment was terminated because of her gender, had no statutory cause of action because Congress had *exempted itself* from Title VII, *id.* at 247. With three exceptions relevant to the Library, *see supra* n.5, only upon enactment of the Accountability Act did Congress extend application to itself of *some* employment laws, and then only those applicable to the private sector, necessarily excluding First Amendment constitutional claims. In the sixteen years since Congress received the mandated study[11] of whether the rights, protections, and procedures for Library employees were "comprehensive and effective," 2 U.S.C. § 1371(c), Davis's supervisor (Daniel P. Mulhollan) does not suggest Congress has addressed how constitutional claims of Library employees should be resolved.

---

in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly."

*Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (alteration in original)); *see also Rankin v. McPherson*, 483 U.S. 378, 383–84 (1987); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605–06 (1967).

[11] *See* Study of Laws, Regulations, and Procedures at The General Accounting Office, The Government Printing Office, and The Library of Congress, at 121–22 (Dec. 31, 1996), *available at* http://www.compliance.gov/reports-studies/sec230/sec230_12-96.pdf.

The Supreme Court has long acknowledged the Judicial Branch's competence to review congressional employment decisions:

> [J]udicial review of congressional employment decisions is constitutionally limited only by the Speech or Debate Clause of the Constitution . . . . [W]e conclude that if respondent is not shielded by the Clause, the question whether his dismissal of petitioner violated her Fifth Amendment rights would . . . require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a lack of respect due a coordinate branch of government, nor does it involve an initial policy determination of a kind clearly for non-judicial discretion.

*Davis*, 442 U.S. at 235 n.11 (internal quotations, citations, and alterations omitted); *see* S. REP. NO. 103-397, at 7–8.

Other special factors do not counsel against recognizing Davis's *Bivens* action. *Wilkie*, 551 U.S. at 537, is instructive. There, the plaintiff alleged various private property and tort-like invasions by federal employees, which the Court characterized as "death by a thousand cuts." *Id.* at 555. The Court explained that he "ha[d] an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints," *id.* at 553, which created "no intuitively meritorious case for recognizing a new constitutional cause of action, but neither . . . plainly answer[ed] no to the question whether [the plaintiff] should have it," *id*. at 554. Upon weighing the reasons for and against recognizing a right (the *Bivens* step two question), the Court concluded in view of "the serious difficulty of devising a workable cause of action," where "[a] judicial standard to

identify illegitimate pressure going beyond legitimate hard bargaining would be endlessly knotty to work out," that any damages remedy against the Executive Branch employees "who push too hard for the Government's benefit" against a private property owner's rights would "come better, if at all, through legislation." *Id.* at 562. No such difficulty exists here, for Davis's claim rests on a claimed violation of his liberty interests that are protected under the First and Fifth Amendments. *See infra* Part II.A.

In fact, in *Wilkie* the Court contrasted the facts of that case with that of "an employee who spoke out on matters of public concern and then was fired," *id*. at 556, where "the outcome turns on 'what for' questions: what was the Government's purpose in firing him and would he have been fired anyway? Questions like these have definite answers, and we have established methods for identifying the presence of an illicit reason," *id.* These are the questions posed by Davis's *Bivens* claim. Furthermore, that the Supreme Court indicated a federal employee suing for termination in violation of the First Amendment would be a candidate for a *Bivens* action underscores the court today has gone too far, effectively holding that the CSRA precludes *all* federal employee *Bivens* actions for termination of employment in violation of the First Amendment. Yet the only way to give meaning to the Supreme Court's statement in *Wilkie*, given that the Court has held such claims by Executive Branch employees are precluded, *see Bush*, 462 U.S. at 386, is to conclude that the Court, just five years ago, implied that *Bivens* actions would not be so precluded for employees of the other branches, not covered by the CSRA. Although the Supreme Court has recognized *Bivens* actions in only a few instances, *see* Op. at 5, this likely reflects the proliferation of comprehensive remedial statutory schemes, not a conclusion that there should be no *Bivens* action in the absence of such a scheme covering the claimant. *See id.* at 576 (quoting *Carlson v. Green*,

446 U.S. 14, 18 (1980) (Ginsburg, J., concurring and dissenting in part). *But see Minneci*, 132 S. Ct. at 626 (Scalia, J., joined by Thomas, J., concurring). Courts must

> presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights.

*Passman*, 442 U.S. at 242.

For these reasons, "the court's decision is not the product of the application of the *Bivens* doctrine to [Davis's] claims," but instead a "refusal to acknowledge precedent [holding] that *Bivens* is a remedial doctrine," *Wilson*, 535 F.3d at 722 (Rogers, J., dissenting), and here that Congress has said nothing about what remedies should be available to Library employees for the alleged constitutional violations. With today's decision, the court goes beyond *Wilson*, where it "cede[d] to Congress the judiciary's defined role to decide issues arising under the Constitution," *id.*, and now abandons the judiciary's role even where all evidence regarding purpose demonstrates that Congress did not envision itself as legislating on the question now before the court. Contrary to the precedent of the Supreme Court and this court, the court turns the *Bivens* doctrine on its head to require some "special factor" in *favor* of recognizing a *Bivens* claim. Whatever "deference to the informed judgment of Congress," Op. at 8, is appropriate with respect to Executive Branch remedial schemes, *see Bush*, 462 U.S. at 389, where Congress is alleged to violate employee rights, Congress itself

recognized that Judicial Branch review does not pose the same separation of powers concerns as does Executive Branch review, *see* S. REP. NO. 103-397, at 7–8, a sufficient special factor *favoring* recognizing a *Bivens* remedy.

**II.**

In moving to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Daniel Mulhollan, who was Davis's supervisor at the CRS and fired him, asserted the defense of immunity. On appeal, he maintains that he is entitled to qualified immunity in part because the potential harm to the CRS from Davis's two opinion pieces "was clear from the complaint and the documents incorporated by reference," and he "did not need to develop an evidentiary record." Appellants' Reply Br. at 18. Taking Mulhollan at his word, his immunity defense would fail, but a remand for fact finding is required.

**A**.

The "necessary antecedent" question to deciding the immunity question is the sufficiency of the complaint's allegations to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Navab-Safavi v. Glassman*, 637 F.3d 311, 315 (D.C. Cir. 2011). Upon *de novo* review of a denial of a motion to dismiss, and accepting, as the court must, the factual allegations in the complaint as true, *Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 940 (D.C. Cir. 2008), Davis's complaint manifestly "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**1**. Based on the analysis in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), this court has developed a four-part test for determining whether an employee's First Amendment rights

have been violated. *See O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998).[12] Mulhollan wisely limits his challenge to the second factor, maintaining that Davis compromised his appearance of objectivity and harmed their working relationship, but that too fails.

The Supreme Court has observed that a "stronger showing [of governmental harm] may be necessary if the employee's speech more substantially involved matters of public concern." *Connick v. Myers*, 461 U.S. 138, 152 (1983). That case involved a workplace questionnaire of little public interest. *Id.* at 151–52. Speech about government policies, on the other hand, is a "paradigmatic matter of public concern." *Sanjour v. EPA*, 56 F.3d 85, 91 (D.C. Cir. 1995) (internal quotation marks, citation, and alteration omitted). To establish governmental harm where a high level policy maker is involved "[a]t a minimum, the employee's speech must relate to policy areas for which he is responsible." *Hall v. Ford*, 856 F.2d 255, 264 (D.C. Cir. 1988). Further, the "simple assertion by [The Library and Mullhollan] without supporting evidence of the adverse effect of the speech on" CRS's function is inadequate. *Navab-Safavi*, 637 F.3d at 318 (internal quotation marks and citation omitted).

---

[12] The four factors are: (1) whether the employee's speech was "on a matter of public concern"; (2) "whether the governmental interest in" non-disrupted, efficient public services "outweighs the employee's interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what the employee has to say"; (3) whether the employee's "speech was a substantial or motivating factor in prompting the retaliatory or punitive act of which she complains"; and (4) whether the employer "would have reached the same decision even in the absence of the protected conduct." *O'Donnell*, 148 F.3d at 1133 (internal quotation marks and citations omitted).

In *Pickering*, 391 U.S. at 569–70, the court concluded that there was no threat to harmony between the employee, co-workers, and the supervisor where "[t]he statements [were] in no way directed towards any person with whom [the employee] would normally be in contact."  The Court emphasized that the public had a strong interest in being exposed to the viewpoints of teachers on issues of school funding: "Teachers are, as a class, the members of a community most likely to [be] informed . . . . [I]t is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."  *Id.* at 572. Davis's two opinion pieces, relying on his professional experience prior to his employment with CRS, were not directed at Mulhollan, the Library, the CRS, or any member of Congress. Compl. ¶¶ 47, 50.  In each he was identified as a former chief prosecutor for military commissions at Guantanamo; as such Davis was likely one of the more informed persons who could speak publically on the issue.  The public interest in being exposed to his speech is high.

Moreover, Mulhollan concedes that at CRS Davis had no authority over military commission issues.  Rather, he maintains that because the same congressional committees oversee both defense issues within Davis's purview and military commissions, the issues are related enough.  But even if Davis can properly be viewed as a "policymaker," which he disputes, the court in *Hall* was clear that the relation to the policymaker's work area is a "minimum" requirement to show government harm.  Davis's complaint states that Members of Congress were aware that the American Law Division, and not his division, was responsible for issues relating to military commissions, *see* Compl. ¶ 32.  Davis's name has not appeared on any reports to Congress about military commissions, and no congressional inquiries have been directed to him on that subject. *Id.* ¶ 29. *Cf. Rankin*, 483 U.S. at 390–91 (whether employee serves in "public contact role" relevant to government harm inquiry).

Furthermore, "the fact that [Davis's] criticism was cumulative . . . diminish[es] the harm it caused." *O'Donnell*, 148 F.3d at 1138. Not only had Davis spoken publically on military commissions with the CRS's knowledge and was never questioned about those activities, Compl. ¶¶ 33-40, unlike the employee in *O'Donnell*, his criticism was not aimed at his employer or the Congress. The Library *encourages* outside speech by its employees, *id*. ¶¶ 65, 68–69; *see* Library of Congress Regulation 2023-3, section 3 (Mar. 23, 1998); CRS Policy on Outside Speaking and Writing (Jan. 23, 2004), minimizing any potential government harm. Former CRS employees at the Library of Congress have recounted, without contradiction, the tradition of the independent expert analysts at CRS speaking publically on controversial issues of concern to Congress. *See* Br. of *Amici Curiae* Dr. Louis Fisher and Mr. Morton Rosenberg, at 15–17. Davis included no disclaimer in the two published pieces, *see* LCR 2023-3, section 3(B), but neither did he purport to speak, based on his pre-Library employment experience, for anyone other than himself, and the newspapers identified him only as the former chief prosecutor for military commissions who had retired from the military in 2008.

Although Mulhollan claims, pointing to his letter of admonishment to Davis, that his relationship with Davis became strained as a result of Davis's published article and letter, that "simple assertion . . . without supporting evidence of the adverse effect of the speech on [the CRS's functions]" is inadequate. *Navab-Safavi*, 637 F.3d at 318 (internal quotation marks and citation omitted). Otherwise, as Davis suggests, there would be nothing to stop employers from pretextually claiming harm in order to shield themselves from liability. The district court concluded the instances to which Mulhollan pointed, which he initiated, were examples of everyday employer/employee interactions. Mulhollan's more plausible suggestion might be

that the two opinion pieces damaged the non-partisan reputation of the CRS. But Davis's article and letter to the editor do not take a partisan position, instead criticizing decisions and officials in both Democrat and Republican administrations. His situation is in that respect unlike the CRS analyst in *Keeffe v. Library of Congress*, 777 F.2d 1573, 1576 (D.C. Cir. 1985), who attended a partisan political convention, and such a partisan label cannot be ascribed to Davis's speech.

**2.** Davis's complaint also states a plausible claim under the Due Process Clause of the Fifth Amendment. The Library's policies and actions must provide Davis a "reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This requires that "the Library . . . give loud and clear advance notice when it . . . decide[s] to interpret a particular regulation as a prohibition or limitation on an employee's outside activity." *Keeffe*, 777 F.2d at 1583.

In *Keeffe*, the CRS analyst was disciplined for attending a partisan political convention under a Library regulation regarding the potential conflict of interest posed by employees engaging in political activities. *Id.* at 1576. Although the court upheld the regulation (LCR 2023-7, "Unrestricted Political Activities of Library Employees") as facially valid and not impermissibly vague, *id.* at 1579–81, the court found that, as applied to Keeffe, the Library violated her due process rights, *id.* at 1582. She had previously attended a 1974 partisan convention without Library complaint; between 1972 and July 1980 the Library had denied no requests by an employee for clearance to engage in a political activity, *id.*; the Library did not inform Keeffe that it had denied her request until *after* she had left for the 1980 partisan convention, *id.* at 1576. "In light of this background, the Library's course of dealing with her in the summer of 1980 was insufficient to place Keefe on notice that

the prior interpretation [of the regulation] had changed." *Id.* at 1582.

So too here. The Library's Policy encourages outside speaking by its employees; Mulhollan had previously approved Davis's requests to speak and write on the topic of military commissions, *see* Compl. ¶¶ 33–38; Davis had made public statements in the past similar to those published in the two newspapers, *id.* ¶ 36; Mulhollan had never previously told Davis that his outside speaking on the topic of military commissions was harmful to the Library, the CRS, or was prohibited, *id.* ¶ 40. As in *Keeffe*, Mulhollan and the Library's "course of dealings," 777 F.2d at 1582, "entitled [Davis] to read the Library's overly long silence as assent," *id.* at 1583.

The responses by the Library and Mulhollan are unpersuasive. Although they maintain that as a probationary employee Davis had no property interest in his job, *see Piroglu v. Coleman*, 25 F.3d 1098, 1104 (D.C. Cir. 1994), Davis's due process claim is based on the violation of his liberty interest in free speech. Among the reasons government employees may not be terminated without violating their due process rights is for their protected interest in the right to speak. *See supra* Part I.C. Further, Davis is not challenging the Library's exercise of discretion not to have disciplined him for his previous outside speaking, but Mulhollan's termination of his employment without "loud and clear advance notice," *Keeffe*, 777 F.2d at 1583, given the Library's previous course of dealing, that his conduct could be punished. Mulhollan assented to Davis's previous speaking engagements, *see* Compl. ¶¶ 34–35, and he terminated Davis's employment because of his speech. Regardless of whether Mulhollan had personally caused "the Library's overly long silence," *Keeffe*, 777 F.2d at 1583, due process required that as Davis's supervisor he end the silence by giving prior fair notice that Davis's conduct was subject to

punishment and could result in the termination of his employment at the Library.

**B.**

Government officials are shielded from personal liability "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). What is "clearly established" is not to be defined at a "high level of generality," *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2084 (2011), and although "[the Supreme Court] do[es] not require a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 2083. The district court denied Mullhollan's motion to dismiss the complaint on the ground of qualified immunity, agreeing with Davis that Mulhollan's own conduct indicated the First Amendment right in question was sufficiently clear to him. The complaint alleged that Mulhollan asked Davis to "acknowledge that . . . the First Amendment . . . did not apply" to the publication of the two opinion pieces that were the basis for the termination of his employment. Compl. ¶¶ 56. As the district court found, "Mulhollan was at least aware of 'a general constitutional rule already identified in the decisional law," *Hope [v. Pelzer]*, 536 U.S. [730,] [] 741 [(2002)], and that this constitutional rule might have applicability to [Davis's] articles." Mem. Op. at 40.

Although qualified immunity defenses should be decided at "the earliest possible stage in litigation*," Hunter v. Bryant*, 502 U.S. 224, 227 (1991), where the *Pickering* test applies, unless the "relative weight of the governmental interest and established constitutional rights . . . [are] quite evident from the pleadings," a decision may "properly await some evidentiary development" to determine "fact-dependent" interest balancing and thus may

be inappropriate at the Rule 12(b)(6) stage. *Navab-Safavi*, 637 F.3d at 318. To the extent the Library and Mullhollan contend that the potential harm to CRS was clear from the complaint and the documents it incorporated by reference, *see* Appellant's Reply Br. 18–19, they rely on factual assertions about the nature of Davis's position and job responsibilities, CRS's interest in maintaining the appearance of objectivity and lack of bias, and the content and tone of Davis's opinion pieces – aspects of which Davis disputes and are either untethered to or inconsistent with the record now before the court. Under the circumstances, a remand is required to develop a factual record.

Accordingly, I would affirm the district court's ruling that Davis's complaint stated a valid *Bivens* claim and the denial of the motion to dismiss the complaint except I would remand for further fact-finding on the qualified immunity defense; I respectfully dissent.